IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 26, 2001 Session

## ANTHONY MURRAY v. DEWEY L. LINEBERRY

**Appeal from the Circuit Court for Wilson County**
**No. 10686     Julian P. Guinn, Judge**

**No. M2001-00097-COA-R3-CV - Filed September 27, 2001**

This appeal arises from a defamation action. The appellant sued the appellee for slander after the appellee aired a series of political advertisements including statements about the appellant, a deputy sheriff. The Wilson County Circuit Court granted the appellee's motion for summary judgment. We affirm the trial court's decision.

**Tenn. R. App. P. Rule 3; Judgment of the Circuit Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, and PATRICIA J. COTTRELL, JJ., joined.

Neal Agee, Jr., Lebanon, Tennessee, for the appellant, Anthony Murray.

Parks T. Chastain and Elliott Ozment, Nashville, Tennessee, for the appellee, Dewey L. Lineberry.

## OPINION
### I.

This is an appeal from the trial court's order granting the appellee's motion for summary judgment in a defamation action. The appellee ran for the office of Sheriff of Wilson County for the August 6, 1998 election. As part of his campaign, beginning on July 13, 1998, he aired six videotaped political advertisements on cable television. The advertisements contained numerous references to practices in the sheriff's department and comments about the behavior of deputies, sometimes by name. The plaintiff/appellant in this case is one of those deputies.

At some point before airing the advertisements, appellee heard some Nashville Metropolitan police officers discussing a deputy sheriff in Wilson County who had been involved in a domestic dispute. Later, a young woman approached the appellee and told him she had been involved in a domestic dispute with the appellant. Appellee also started receiving anonymous letters from "one

of the sheriffs [sic] many snitches" regarding practices in the sheriff's department. Appellee decided to use the information he had discovered in several advertisements during his campaign for sheriff.

The relevant portions of the political advertisements identify the appellant as a deputy sheriff whose father is a county commissioner.[1] The first advertisement includes a veiled comment about a deputy being involved in a violent domestic dispute and how, when the appellee is elected, that kind of behavior will be rewarded with dismissal not promotion. Later advertisements included a lengthy reading from a complaint filed in federal court by a female plaintiff against the appellant and the sheriff alleging that the appellant had severely battered the plaintiff while they were living together and that he and the sheriff conspired to cover it up. The complaint also alleged that the sheriff had coerced the appellant into initiating a criminal complaint against the plaintiff in the federal lawsuit, resulting in her arrest and rough treatment in state court. In another advertisement the appellee asserted that the appellant had been involved in other bad acts but that his file had been cleaned out because the sheriff needed the appellant's father's vote on the county commission.

The trial judge granted the appellee's motion for summary judgment.

## II.

Upon review of a grant of summary judgment, this court must determine whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *See Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). As this inquiry involves purely a question of law, our review is de novo without a presumption of correctness. *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 894 (Tenn. 1996). Summary judgments are appropriate only where there is no genuine issue of material fact relevant to the claim or defense contained in the motion and the moving party is entitled to a judgment as a matter of law on the undisputed facts. S*ee* Tenn. R. Civ. P. 56.03; *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Courts reviewing summary judgments must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Omer*, 952 S.W.2d at 426; *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993).

The trial court's order reads as follows:

> Firstly, assuming, in arguendo, that the plaintiff is a private person rather than a public official, the Court finds as follows: As to what has been termed segments 1, 2, 3, 4, and 5 they are substantially true. As to segments 4 and 6, the Court finds that they are not defamatory. As to all segments, the Court finds that there is just absolutely, completely no proof of damages.

---

[1]We reprint the relevant portions of the advertisements in full as an appendix to this opinion.

Secondly, the preceding findings were made based upon the assumption that he was a private person. This Court finds that the plaintiff is, in fact, a public official and the grounds for finding that is that the acts that have been alleged and to which he has admitted do, indeed, reflect on his conduct fitness or his role in his public capacity as a police officer. Having made that finding, this Court finds that there is no proof of malice to be found anywhere in this record.

## III.
### IS THE APPELLANT A PUBLIC OFFICIAL/FIGURE?

In a case of libel or slander, the court must first decide whether the individual allegedly defamed is a private person or public official/figure. If an individual is not a public figure, he has a lower threshold to meet in making a defamation case. *See New York Times, Co. v. Sullivan*, 376 U.S. 254 (1964). If he is a public figure, he must prove actual malice on the part of the defendant. *Id.* This court has stated:

> The existence of actual malice is a proper question to be decided by a court in a motion for summary judgment. *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 74 (Tenn. [sic] App. 1986). To defeat the motion for summary judgment, a public official plaintiff must demonstrate evidence of actual malice with "convincing clarity." *Id.* (citing *New York Times*, 376 U.S. at 285-86, 84 S.Ct. at 729, 11 L.Ed. 2d at 710). Actual malice exists when a statement is made with knowledge that the statement is false, or with reckless disregard of whether it is false. *Nichols*, 569 S.W.2d at 415 (quoting *New York Times*, 376 U.S. at 279, 84 S.Ct. at 726).

*Selby v. Ilabaca*, No. 02A01-9503-CV-00058, 1996 WL 219620 at * 4 (Tenn. Ct. App. 1996).

In *Selby,* we held that a police officer was a public official. We stated that a police officer's "duties affect the lives, liberty and property of citizens . . . ." *Selby*, 1996 WL 219620, * 4. We believe that the same is true of any law enforcement officer. Therefore, appellant is a public figure.

The *New York Times* rule, however, raises the standard for recovery only when the alleged defamatory statements relate to the public official's official conduct. *Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn. 1978). With respect to whether a plaintiff's conduct is private rather than connected with his official duties, our Supreme Court has stated:

> The occupant of any position in any branch of government who exercises any public function is subject to the New York Times rule as to all conduct in his official capacity or as to any conduct that might adversely affect his fitness for public office, if he has or "appear(s) to the public to have, substantial responsibilities for or control over the conduct of governmental affairs."

*Id. at 441*. We believe that appellant's conduct amounting to domestic violence constitutes "conduct that might adversely affect his fitness for public office." Allegations of covering up official misconduct would certainly fall into that category.

## IV.
### A. MALICE

On the question of malice, we first note that the appellant was not the object of the political advertisements. The appellee's target was the sheriff, and the story told was mostly about the sheriff's conduct in office. In addition, the appellee presented evidence that he believed the information to be true. In his affidavit, appellee stated that he spoke with the third party, she showed him her medical records, she showed him pictures of her injuries, she showed him a bloody towel that was from the injury, and she showed him the Internal Investigation Statement from the Wilson County Sheriff's Department. The appellant himself admitted he hit the third party over the head with a telephone. Based on his investigation and the corroboration the appellee found, and based on the lack of evidence to the contrary, we find that there is nothing in the record from which an inference could be drawn that the appellee acted maliciously toward the appellant.

### B. DAMAGES

In addition, we find that the appellant has failed to show that he was damaged by the publication of the advertisements. In a defamation case, a plaintiff must prove actual damages resulting from actual injury. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974); *Memphis Publishing Co v. Nichols*, 569 S.W.2d 412, 421 (Tenn. 1978). The United States Supreme Court addressed the issue of actual damages in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). The Court stated:

> We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

*Gertz*, 418 U.S. at 349-50. When looking at damages for a defamation suit this court has stated that, "[t]he issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering." *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 164 (Tenn. Ct. App. 1997) (citing *Handley v. May*, 588 S.W.2d 772, 776 (Tenn. Ct. App. 1979)). When discussing a plaintiff's reaction as anger rather than anguish, this court has also stated that "mere annoyance or loss of peace of mind," are not enough to qualify for actual damages. *Handley*, 588 S.W.2d at 777.

In *Moore v. Bailey*, 628 S.W.2d 431 (Tenn. Ct. App. 1981), we affirmed a jury award in a defamation case. Where the plaintiff presented evidence of the effects of the defamatory statements,

which had been on-going for ten (10) years. The plaintiff in that case stated that he was unable to get away from the statements made by the defendant. The plaintiff was even approached by one of the defendant's employees at Army Guard camp, which caused him to quit the Army Guard. He stated that it was in his mind and disturbed his mind as well as his family. The plaintiff also testified that the statements affected the performance of his duties because it was always on his mind.

In his deposition, the appellant stated that various individuals had approached him concerning the commercials. He stated that this attention embarrassed him. He also stated that individuals from church told the parents of his fiancee at the time that they should keep appellant away from her. He mentioned that he was embarrassed for his parents, his wife, and his in-laws. However, the damages complained of by the appellant never rose above embarrassment stemming from individual encounters. He also stated that he believed he had not been invited to a few private parties due to the advertisements. However, he did not present proof that the advertisements were the reason he was not invited. Appellant did mention that detectives at the Sheriff's office would not work with him and that his own partner had left the department due in part to the allegations on the advertisements. However, appellant's position as a deputy had not been affected.

This situation is not the same as in *Moore*. In *Moore*, the plaintiff testified that the defamatory statements were constantly with him in his day-to-day life. Here the appellant stated that various people asked him about the allegations, but he did not state that the questions were a constant presence in his life. Also, there was no evidence that the embarrassment hampered his ability to perform his job. This evidence does not rise above "anger, mere annoyance or loss of peace of mind." Therefore, we find no proof of actual damages.

We have reviewed the record in this case and find no basis to overturn the trial court's decision to grant the motion for summary judgment. For this reason, we affirm the decision of the trial court and remand the cause to the Circuit Court of Wilson County for any further proceedings that may become necessary. Tax the costs on appeal to the appellant, Anthony Murray.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.

## APPENDIX

<u>Segment 1</u>

I'd like to also add that any deputy, while I'm sheriff, any deputy guilty of domestic violence, your gonna be dismissed. You're not going to be promoted. By that I'm not going to name any names right now, but go ask the sheriff, any of you that know him what's he do to people guilty of domestic violence. Ask him has he promoted any when they should've been dismissed. You know if you're guilty of domestic violence you can't carry a handgun, you can't be an officer, your [sic] through. They need to think about that before they, before they commit the acts. Anyway, you can't, that's not right. I'm not up here trying to prejudge people, but I'm sure not going to try and fix it and cover it up. When I'm sheriff, if you guilty of that, pack your stuff, clean your locker out, your done.

<u>Segment 2</u>

You know Mr. Sheriff, I said if you catch me in a restaurant drinking a beer, it'll be a beer it won't be a Coors Lite in an apple juice glass. I don't deceive or cover up anything. If I'm drinking tea, you can bet it's tea, it's that simple. I don't put one thing in and try to make the people think something else. Well, that infuriated the sheriff, so, that he goes to this restaurant. I'm not calling the restaurant's name or the person's name that said it. He goes over there and he jumps on that person. That person called me back and said hey. That person was scared. That person said help me, help me I need a lawyer and, you know, nobody would help her. So I turned back around, and I really was having trouble getting somebody to help her too. So I put another ad in the paper, and it said several things about how does one man keep so many good men scared out of the sheriff's race. There are deputies serving under the sheriff now that do the job better.

Under Lawdog, hard work will be rewarded not discouraged. I want you to better [y]ourself. Wife beating will no longer be a qualification for your promotion. Well, guess what folks, I put that ad in the Democrat on Tuesday. It hadn't run til Friday. Maybe the Sheriff was psychic I don't know. Wednesday he goes back to this person said, I told you to stop talking to Lineberry. Scared that person. They call me hysterical, scared to death, didn't know what was going to happen. I took that person and got'em a lawyer. That's my hand in it. That's all I've done. Now it's come out and any of you that wants a copy of it can get it, you see, how they took this person that was getting beat, this little girl that didn't weigh 95 pounds soaking wet, she was getting beat, they put ankle chains on her, took her in front of a judge and had her say that she had been whipping the deputy. And then I dig into it even further and this deputy has got a father that's a commissioner. That's what I'm talking about. That's the stuff that's going on. It's filed now, it's public. That was my hand in it. That's it.

<u>Segment 3</u>

Mr. Sheriff, you say you're a good manager. I'm going to challenge you to prove that you're not the most expensive sheriff that's ever been in the state of Tennessee. I got a lawsuit right here in my

hand filed in Federal Court. I'm not going to call the young lady's name that filed it, but it's filed against you and it was filed last week. It's for a couple million dollars. I don't know much about all of this except, I wasn't there, but I've read this lawsuit and any of you wants a copy of it can go down to federal court or you can call down there and get you a copy of it. That's what I did, and you know, I will read you a few things about it. It was about you covering up a crime. It came to do with you deciding one night that that you would just cover it up. Now there ain't no telling how many times you've done it, you know. There's no telling how many times you've actually covered something up. You know, because it's come pretty easy to you, you know. Man calls you in the middle of the night, and just like that, you covered it up. Here we go. On or about June 30, 1997, Defendant Anthony Murray, was residing with Plaintiff in Wilson County. On or about that day Defendant Murray severely beat the Plaintiff causing her severe head injuries as to acquire [sic] hospitalization. That was out of Paragraph 6. Paragraph 7. On or about May 3, 1998, Defendant Murray again severely beat the plaintiff. When she returned to the dwelling, they co-habitated. I'm going to leave out Paragraph 8. It's not much to it. Number 9. Defendant Ashe in his capacity to sheriff of Wilson County was aware of the abusive, violent behavior exhibited by Defendant Murray toward plaintiff. Defendant Ashe under color of state law. In case any of you out there don't realize what color of law is, there's only 10 lawyers in Nashville, Tennessee, that understand the color of law. The color of law is 2800 pages long. There's maybe 2 or 3 in Lebanon that understand it. I could call their names but they don't want to be named it doesn't matter. Anyway it's a big deal, it doesn't, they're not talking about the color of your skin, it is your civil rights the law can't see any color is what they're trying to say but it takes them 2800 pages. It's a big deal. Defendant Ashe under the color of law and pursuant to his duties as the duly elected Sheriff to Wilson County failed to take any action to protect plaintiff or take any legal action to punish Defendant Murray or prevent future incidents of violence. Paragraph 10. Defendant Ashe in his capacity [as] Sheriff of Wilson County and under the color of state law engaged in a conspiracy with Defendant Murray and other members of the Wilson County Sheriff's Department to cover up and keep secret incidents of violence against plaintiff by defendant Murray. Paragraph 11. Defendant Ashe in his capacity as the Sheriff of Wilson County, Tennessee and under the color of State Law insisted on prosecuting Plaintiff for criminal trespass when he was fully aware no such offense had occurred and in that fact at the time of the May 3, 1998 assault plaintiff co-habitated with defendant Murray at the site of the assault. Defendant Ashe threatened on multiple occasions to terminate defendant Murray's employment with Wilson County's Sheriff Department if he failed to go forward swearing out a warrant and prosecuting plaintiff. Number 12. In an attempt to silence the plaintiff and prevent her from taking legal action to readdress the violation of her civil rights, Defendant Ashe and Murray and other members of the Wilson County Sheriff's Department, reckon who they are, have engaged in a course of conduct aimed at intimidating the plaintiff. This course of conduct includes conducting surveillance operations on the plaintiff when no probable cause exists to suspect that she was involved in criminal activities. Threatening the plaintiff and disseminating false and malicious information about the plaintiff. Some or all of these activities have been conducted under the color of State Law. Number 13. As direct and proximate result of the beatings doled out to the defendant by plaintiff Murray, [sic] suffered medical expenses and injuries possible permanent impairment, pain, suffering, loss of wages, possible loss of earning capacity. Number 15. I skipped 14. Plaintiff's rights as codified under the 1st, 4th, 5th, 6th, 8th, 9th, & 14th Amendments to the Constitution

-7-

of the United States have been and continue to be abrogated by the course of conduct in which Defendants Ashe and Murray are engaged. Number 16. The acts of Defendant Murray are repeatedly and violently striking, beating, kicking, and otherwise engaging in abusive and offensive contact constitutes the intentional tort of battery. The acts of Defendant Murray in repeatedly causing the fear imminent and serious bodily harm, Defendant Murray and subjects Plaintiff came [sic] constitutes the intentional tort of assault. It's time we had a sheriff that took up for someone it don't matter who your daddy was or who anybody is related to that will defend you no matter who you are, no matter what you are or what you done, we'll do it right you don't have to sit around and make up a bunch of other, "What happened" . . . . . . . .We need a sheriff that will help you, instead of help you cover it. You're not helping nobody when you cover up a crime. Your [sic] making it, the law, you're tying the laws hands, it's not right. Now back to the script. It's not a script it's a lawsuit you can pick it up at the Federal Court House. Mr. Sheriff this is filed in Federal Court everybody knows it's filed in Federal Court. It's not in Lebanon, a little different you broke a federal law. The failure of defendant Ashe who knew and condoned the physical, emotional abuse suffered by plaintiff at the hands of defendant Murray, to punish in any way intervene Plaintiff's rights as he has taken oath to do by law constitutes a tort of outrageous conduct and/or intentional infliction of emotional distress. Defendant Ashe's course of conduct in forcing the prosecution of Plaintiff when he knew no crime had transpired, and further actions in harassing and surveilling Plaintiff constitutes the tort of outrageous conduct. There's a lot more here to read. I'm not going to take your time with it. A lot of people don't understand the difference in an intentional tort and . . . . .

You said you wanted if anything happened to you on the radio station that you wanted officers from your department to help you. Well the person that wrote this thinks maybe it was just to get you so you'd cover up any wrong doing on your part you know like you did for this Murray thing I read before but I'll tell you something else and I'm going to leave this boy's name out of it.

Segment 4

That was another one where he covered up a crime, attempted to cover it up, and that's the way this lawsuit reads. I'm not the judge and jury on that, but it was just where they, um . . a girl was being beat and they put ankle chains on her and had her say that she had been beating the deputy and come to find out when I dug all into it, the deputy, the reason they took this approach, the deputy had a father that's a commissioner. Well that's what I've been talking about the whole time. That whole thing's tied together in a big ball of wax. You know, I started to just jerk the sheriff out and now, I've ended had to get them all. You see, but I'm only going to get the ones that are trying to be connected. Most of them can be converted. You see, when I get there and see what I'm about they'll stay with me. And they'll, they'll at least respect me enough to do their job and earn their pay.

Segment 5

You couldn't get your hand on that money. That's the deal. Then you got deputy's [sic] running the bond companies, good grief I don't understand it and one more thing you asked me about the lawsuit, the federal lawsuit on the 2.1 million dollars. The federal lawsuit you asked me about that, you

know people are missing the point on that, a little girl got beat up that's bad, that's terrible. That's not the real point. The man beat the girl up that's a postage stamp laying on a football field when it's all over with that's all that is but the big crime the thing they ran a bull elephant down Main Street and nobody saw it was that the Sheriff cover it up. If the Sheriff's convicted of that he can't be Sheriff no more. What are we up here talking about that's what I'm trying to tell you. That's the blimp that went down and nobody saw it or they don't want to talk about it.

Segment 6

Bubba Murray lawsuit- This is the second lawsuit Bubby, this fella calls him Bubby, Bubby Murray, has gotten the county in to [sic] for the past couple of years. The first lawsuit was the Thaker suit. The county insurance had to pay this. Bubba went around bragging that his file had been cleaned up. Well, all the past write ups by Lt. Fox, evidently Lt. Fox had been writing him up and they pulled all that out of his file, you see, to keep the people that sued from getting a hold of that file you see because if they had of they could use it as evidence in court. If you wonder why Bubby is so important that Ashe would risk so much covering up for him I guess it's because he's the commissioner's son and Ashe needs all the help he can get when he proposes another budget increase. Now I got taped meetings a lot of tapes. But I got one right here that's a lot more interesting than others . . . . . . .